**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BRUCE WILSON,

                Plaintiff,

vs.                                  Case No. 8:08-cv-1063-T-23JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

## I.  Status

Bruce Wilson ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for supplemental security income. His alleged inability to work is based on the following impairments: "[m]ental [i]llness"; "[b]ipolar disorder"; "depression"; "hear[ing] voices"; "see[ing] things"; and a "[b]ack injury." Transcript of Administrative Proceedings ("Tr.") at 84. Plaintiff was found not disabled by Administrative Law Judge ("ALJ") Steven D. Slahta, in a Decision entered on June 29, 2007. Tr. at 17-28. Plaintiff has exhausted the available administrative remedies and the case is properly before the Court.

---

[1]      Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida ("Local Rule(s)"), within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking the factual allegations on appeal.

Plaintiff argues the ALJ erred in two ways: (1) by improperly discounting Plaintiff's Global Assessment of Functioning ("GAF") scores[2] assigned by Plaintiff's "treating source" (Doc. No. 18; "Pl.'s Mem." at 2-8); and (2) by failing to properly consider and evaluate the side effects of Plaintiff's medications (id. at 8-10). The undersigned finds that the ALJ's Decision with respect to both issues is supported by substantial evidence in the record; accordingly, it is recommended that the Decision be **AFFIRMED**.

## II. Background

Plaintiff, who was born in 1954, was fifty-two years old when he had his hearing before the ALJ on November 30, 2006. Tr. at 78, 362. Plaintiff alleges the onset date of disability was August 1, 2001. Tr. at 78. Plaintiff's past relevant work was at a body shop performing body work, painting, and supervision of the shop. Tr. at 85.

### A. Medical Evidence in the Record

The earliest treatment notes in the record are from the Family Emergency Treatment Center of Personal Enrichment Through Mental Health Services ("PEMHS"), beginning in September 2001. Tr. at 108-09. On September 24, 2001, Plaintiff's "[i]dentified problem" was depression. Tr. at 109. The plan was to discuss with a nurse practitioner possible medications aimed at combating the depression. Tr. at 109. On September 27, 2001, Plaintiff arrived for an appointment and admitted to drinking alcohol that day, so his appointment was rescheduled for the next day. Tr. at 110. On September 28, 2001, Plaintiff was seen for "[b]rief counseling" and it was noted that a doctor had prescribed the

---

[2]    "The [GAF] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." Mathis v. Astrue, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) at 32).

medication Paxil. Tr. at 110. At that time, Plaintiff drank approximately one quart of beer three to four times per week. Tr. at 110. On October 5, 2001, Plaintiff had been drinking the previous night, and he would not receive medications until he brought in a "signed A.A. attendance sheet for 1 week[.]" Tr. at 110. The last treatment note from this time period is undated, but presumably the appointment took place before October 20, 2001 because it was noted that Plaintiff had to keep his next October 20, 2001 appointment to continue with the treatment plan. Tr. at 111. Plaintiff was prescribed the medications Zyprexa and Paxil. Tr. at 111.

Plaintiff was next seen at Suncoast Center for Community Mental Health ("SCCMH") on May 15, 2002 for a Mental Status Assessment. Tr. at 195-96. Plaintiff was apparently referred to SCCMH due to "[d]epression, anxiety, [n]ot eating properly, [and] irregular sleeping." Tr. at 195. Plaintiff was "angry" with himself and had a "violent temper" toward his family. Tr. at 195. His appearance was appropriate, attitude was cooperative, and thought process was clear. Tr. at 196. However, in the "[i]nsight" category, it was noted that he was "not aware of [the] extent of [his] problems[.]" Tr. at 196. Plaintiff reported no suicidal ideation or intent, but he did report past and present homicidal ideation and intent. Tr. at 196. The provisional diagnosis was "manic depression" and "[a]lcohol [d]ependence[.]" Tr. at 196.

On May 28, 2002, Plaintiff was seen at SCCMH for a "Psychiatric Evaluation/Mental Status Examination" by Patricia Fradley, A.R.N.P. (Advanced Registered Nurse Practitioner) ("Ms. Fradley"). Tr. at 193-94. On this date, Plaintiff was "alert, oriented, cooperative, [had] mild to moderate anxiety, [and] no abnormal motor activity." Tr. at 194. Plaintiff had a

"mildly depressed" mood and a "slightly blunted" affect. Tr. at 194. Plaintiff's "explanations [we]re convoluted with some paranoid appearance," but Ms. Fradley had difficulty ascertaining whether Plaintiff was being truthful. Tr. at 194. Plaintiff did have overall guardedness. Tr. at 194. Plaintiff denied homicidal or suicidal ideas, and Ms. Fradley thought he was not a danger to himself or others. Tr. at 194. Plaintiff was diagnosed with bipolar disorder and assigned a GAF score of forty-eight. Tr. at 194. Although Plaintiff was not prescribed any medication at that time, he was given samples of Risperdal and told to take them nightly, presumably until his next visit. Tr. at 194.

On June 18, 2002, Plaintiff appeared at SCCMH and reported feeling depressed and suffering from anger issues and anxiety. Tr. at 185. In an "Initial Bio-Psychological Assessment," it was reported Plaintiff was aware he needed help. Tr. at 190. Plaintiff was well groomed, cooperative, spoke coherently, had no abnormal thought content (except suspiciousness of others), and normal motor activity. Tr. at 191. He was diagnosed with manic depression and alcohol dependence. Tr. at 191. A GAF score of forty-eight was assigned. Tr. at 191. On August 28, 2002, Plaintiff's file was closed due to "[v]oluntary withdrawal."[3] Tr. at 184.

Plaintiff returned to PEMHS on March 29, 2003. Tr. at 112-13. Plaintiff reported "feeling depressed," "hearing voices again," and "running low on his medication." Tr. at 112. Plaintiff also reported "experiencing auditory hallucinations." Tr. at 112. The hallucinations were apparently telling Plaintiff to "'hurt[] those who keep messing with me.'" Tr. at 112

---

[3]     Although the Transfer/Closing Summary lists the last treatment date as July 3, 2002, Tr. at 184, the last date in the record is June 18, 2002. Tr. at 185.

(quoting Plaintiff). Plaintiff's mood was "mildly dysphoric" and his insight and judgment were "fair." Tr. at 112. The diagnostic impression of Psychiatrist Hector Corzo, M.D. ("Dr. Corzo") was mainly "[a]typical psychosis[.]" Tr. at 113. A GAF score of thirty was assigned. Tr. at 113. Plaintiff was apparently "admitted and stabilized" following this evaluation. Tr. at 113.

On April 28, 2003, Plaintiff appeared at St. Anthony's Emergency Department. Tr. at 114-24. He complained of migraines and dizziness. Tr. at 115. Plaintiff had been "feeling bad" for about two weeks, with the feeling occurring "when he [was] working as [a] roofer." Tr. at 121. Plaintiff was discharged the same day, Tr. at 118, and was instructed to "drink plenty of fluids" and seek help from a clinic. Tr. at 120.

Plaintiff returned to SCCMH on April 29, 2003 "request[ing] medication and counseling for symptoms of Bipolar I Disorder." Tr. at 182. Plaintiff's appearance was "average," his attitude was "cooperative," his mood was "irritated," his thought process was "tangential," his memory was "intact," and his insight and judgment were "poor." Tr. at 183. Plaintiff denied hallucinations or delusions. Tr. at 183. He did have homicidal ideation, but no homicidal intent. Tr. at 183. Plaintiff was provisionally diagnosed with bipolar disorder by Jeanne Trudeau, M.A. Tr. at 183. Also on April 29, 2003, Plaintiff was seen by staff at the Family Emergency Treatment Center of PEMHS for a "Psychological Evaluation/Screening." Tr. at 129. Plaintiff's goal upon leaving the Center was to keep all his appointments. Tr. at 132. Finally, on the same day, Plaintiff appeared at the Pinellas County Department of Social Services for headaches and dizziness.[4] Tr. at 258-65. He was given instructions to cure his

---

[4]    The documentation for this visit was received subsequent to Plaintiff's hearing before the ALJ. See Tr. at 258.

headaches and heat illness. Tr. at 262. An appointment was made for May 27, 2003, but Plaintiff did not appear for that appointment. Tr. at 258, 263.

On May 15, 2003, Plaintiff was seen at PEMHS by Karen O'Connell, A.R.N.P. ("Ms. O'Connell"). Tr. at 126-28. Plaintiff had "sporadic productivity and some mental confusion and depression." Tr. at 126. Plaintiff denied "having any feelings of harming others." Tr. at 127. He reported being "depressed with diminished joy[.]" Tr. at 127. He also reported "periods of irritability[.]" Tr. at 127. He denied being "influenced by his auditory hallucinations[.]" Tr. at 127. Ms. O'Connell did not consider Plaintiff "to be an imminent harm to [him]self or others." Tr. at 127. The diagnosis was psychosis, depression, and alcohol abuse. Tr. at 128. A GAF score of forty-three was assigned. Tr. at 128. Plaintiff was given Risperdal, Paxil, and Desyrel, as previously prescribed by Dr. Corzo. Tr. at 128.

On August 5, 2003, Plaintiff was seen at SCCMH for an "Initial Assessment." Tr. at 173. He requested to get back on his medications for depression, anxiety, and sleep disturbance. Tr. at 173. Plaintiff was cooperative but had suspicious thought content. Tr. at 179. He wore sunglasses throughout the interview. Tr. at 179. He had no suicidal ideation and his homicidal ideation was described as "[l]ow." Tr. at 179. The diagnosis was bipolar disorder and a GAF score of forty-five was assigned. Tr. at 179, 169. One of Plaintiff's goals was to "seek gainful employment in the next 6 mo[nth]s." Tr. at 170.

Plaintiff was also seen for a "Psychological Evaluation/Screening" at the Family Emergency Treatment Center of PEMHS on August 5, 2003. Tr. at 134. Plaintiff appeared "calm w[ith] slightly disorganized thought." Tr. at 135. The recommendation was "[m]edical [p]sychiatric [s]ervices." Tr. at 135.

Plaintiff returned to SCCMH on August 20, 2003 and was seen by Ms. Fradley. Tr. at 165-66. Although on medications, Plaintiff still reported "hearing voices, particularly calling names and making strange sounds." Tr. at 165. A GAF score of fifty was assigned. Tr. at 166. He was prescribed Zyprexa and Paxil. Tr. at 165. On September 17, 2003, Plaintiff returned and reported to Ms. Fradley that he was "doing well," with a stable mood. Tr. at 164. Plaintiff was directed to continue taking the previous medications, but to take Zyprexa "earlier in the evening" and take Paxil in the evening, as opposed to the morning. Tr. at 164. A GAF score of fifty-two was assigned. Tr. at 164. On September 19, 2003, Plaintiff's objectives and goals were assessed–he was improving and assigned himself a five out of ten for "overall progress[.]" Tr. at 163. The GAF score was fifty. Tr. at 163. Plaintiff missed his appointments on October 15, 2003 and November 12, 2003. Tr. at 162, 161.

On November 12, 2003, a "Medical Summary Sheet" from the Florida Department of Health indicated Plaintiff had "allege[d] back injury, [but] did not respond to letters sent [or] phone messages[.]" Tr. at 138. Accordingly, it was concluded there was "insufficient evidence to pursue [the] claim." Tr. at 138. On November 13, 2003, a "Psychiatric Review Technique" was completed by David Grippe, M.D. ("Dr. Grippe"). Tr. at 139-52. Dr. Grippe noted there was insufficient evidence to assess Plaintiff's medical condition. Tr. at 139, 151. No other findings were made. Tr. at 139-52.

Plaintiff appeared for his December 31, 2003 appointment with SCCMH, explaining that the previous two appointments were missed "[d]ue to the [h]olidays[.]" Tr. at 159. Plaintiff's self-assigned score for "overall progress" was three out of ten. Tr. at 159. The GAF score was forty-five. Tr. at 159. Plaintiff returned January 15, 2004, this time assigning

himself a four out of ten for "overall progress[.]" Tr. at 158. The GAF score was forty-seven. Tr. at 158.

On February 4, 2004, Plaintiff was seen by Ms. Fradley at SCCMH. Tr. at 156. Plaintiff had discontinued using Zyprexa, as he was "not sure he want[ed] to take it." Tr. at 156. He was still taking Paxil. Tr. at 156. He was directed to continue taking Paxil and to take Seroquel. Tr. at 156. The self-assigned score was three out of ten. Tr. at 157. A GAF score was not assigned. Tr. at 157. Plaintiff returned to see Ms. Fradley on March 10, 2004, and April 14, 2004, generally reporting that the medications were working well. Tr. at 154, 256. He was directed to continue taking the same medications. Tr. at 154, 256. The GAF score on both occasions was fifty. Tr. at 154, 256. Plaintiff's self-assigned progress score on April 14, 2004 was four out of ten. Tr. at 257. During a treatment plan review session on May 11, 2004, Plaintiff assigned himself a progress score of five out of ten. Tr. at 255.

On May 11, 2004, Plaintiff returned to SCCMH, but instead of seeing Ms. Fradley, he was seen by Lois Corwin, A.R.N.P. ("Ms. Corwin"). Plaintiff was told to continue taking his medications. Tr. at 250. The GAF score was forty-nine. Tr. at 250. A clinical progress note from June 9, 2004 indicated Plaintiff's GAF score was fifty. Tr. at 248. Plaintiff's self-assigned progress score on that date was five out of ten. Tr. at 247. Plaintiff reported to Ms. Fradley "feeling well[.]" Tr. at 246. His medications remained the same. Tr. at 246. On July 13, 2004, the dosages of Plaintiff's medications were increased. Tr. at 245. No adverse side effects were reported. Tr. at 245. Plaintiff's GAF score on that date remained at fifty. Tr. at 245. Plaintiff's self-assigned progress score was six out of ten. Tr. at 244.

On May 28, 2004, Plaintiff was examined by Linda Appenfeldt, Ph.D. ("Dr. Appenfeldt") at the request of Plaintiff's disability determinations adjudicator. Tr. at 197. Dr. Appenfeldt noted "considerable vagueness and inconsistencies" in Plaintiff's self-reported history. Tr. at 197. Plaintiff's main complaints were "depression and anxiety." Tr. at 199. However, Plaintiff did not display "overt delusional material, formal thought disorder, or anxiety[.]" Tr. at 198. Although Plaintiff claimed seeing visions and hearing voices, "he was unable to elaborate." Tr. at 198. With regard to visions and voices, Dr. Appenfeldt did not see any "subtle or overt indication of symptomatology." Tr. at 199. Dr. Appenfeldt stated, "I would recommend taking a very close look at this claimant by supplementing his self-reports with as many additional sources of objective information available due to inconsistencies noted in the evaluation." Tr. at 199. Dr. Appenfeldt concluded by indicating there was "insufficient evidence to offer prognostic or clinical impressions[.]" Tr. at 199. She suggested obtaining medical records from the mental health providers Plaintiff was seeing. Tr. at 199.

On June 7, 2004, a disability determinations physician completed a "Mental Residual Functional Capacity Assessment." Tr. at 200-03. The physician opined Plaintiff was "Not Significantly Limited" in all areas of inquiry except two: "ability to maintain attention and concentration for extended periods," and "ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Tr. at 200-01. In those areas, the assessment was "Moderately Limited[.]" Tr. at 200-01. A "Psychiatric Review Technique" from the same date (and presumably the same physician) indicated

Plaintiff had an impairment that did not satisfy the criteria identified in the section entitled, "Affective Disorders"; namely, "[B]ipolar on meds[.]" Tr. at 207. The Rating of Functional Limitations was as follows: a degree of "Mild" was identified in the areas of "Restriction of Activities of Daily Living," "Difficulties in Maintaining Social Functioning," and "Difficulties in Maintaining Concentration, Persistence, or Pace[.]" Tr. at 214. Plaintiff was assigned "One or Two" "Episodes of Decompensation[.]" Tr. at 214.

Plaintiff did not return to see Ms. Fradley at SCCMH until October 18, 2004. Tr. at 234. On that date, he reported "feeling better on the current regimen," so the regimen was continued. Tr. at 234. The GAF score was fifty. Tr. at 234. On December 27, 2004, Plaintiff was "dressed neatly" and was "well organized" but "mildly guarded." Tr. at 233. Plaintiff "reporte[d] feeling well" so his regimen of medications was continued. Tr. at 233. His GAF score was fifty-two. Tr. at 233. On April 26, 2006, Plaintiff's file at SCCMH was closed because he had not been seen for almost one and one-half years. Tr. at 230.

Plaintiff returned to SCCMH on August 2, 2006, requesting services through the Center. Tr. at 225. At that time, Plaintiff reported "depressed mood, mood swings, [and] auditory hallucinations," as well as feeling "hopeless and helpless[.]" Tr. at 226. He self-assigned a score of three out of ten when asked about the intensity of his symptoms. Tr. at 229. His GAF score was fifty. Tr. at 225. Plaintiff was seen by Ms. Fradley on August 5, 2006 and September 26, 2006.[5] Tr. at 224. On September 26, 2006, Plaintiff reported taking his medication as directed. Tr. at 224. Ms. Fradley opined that he was "doing much

---

[5] Ms. Fradley's notes from September 26, 2006 indicate she saw Plaintiff August 5, 2006. Tr. at 224. However, the record does not contain notes from the August 5, 2006 visit.

-10-

better" and was "much more forthright[.]" Tr. at 224. Plaintiff's GAF score at that time was fifty. Tr. at 224. Clinical Progress Notes from September 26, 2006 and October 24, 2006 document GAF scores of fifty. Tr. at 223, 222.

The record contains scattered notes from Your Care Clinics, appearing to be from December 2006.[6] Tr. at 266-69. Plaintiff was referred for "MRI Brain" due to chronic headaches, referred to "Ophthalmology" for blurred vision, referred for a "screening colonoscopy" for "GI" issues, and referred to "Neurology" for chronic headaches. Tr. at 267-68.

On January 16, 2007, Plaintiff was seen by Darlene McLaughlin, A.R.N.P. ("Ms. McLaughlin") at SCCMH.[7] Tr. at 323. Plaintiff reported "feeling quite good on his current medication." Tr. at 323. His GAF score at that time was fifty-five. Tr. at 323. On March 1, 2007, Plaintiff's file at SCCMH was closed again, as he had not been seen since February 13, 2007. Tr. at 322.

On February 13, 2007, Plaintiff was evaluated by Gerald J. Hodan, Ph.D. ("Dr. Hodan") "in conjunction with his application for Social Security Disability Benefits." Tr. at 270.[8] Dr. Hodan did not make any remarkable findings. He noted that "[t]here were no indications for perceptual distortions or any formal thought disorder." Tr. at 271. Plaintiff told Dr. Hodan his hallucinations were in remission. Tr. at 271. Plaintiff told Dr. Hodan he was

---

[6]     This documentation was received subsequent to Plaintiff's hearing before the ALJ. See Tr. at 266.

[7]     All documentation from SCCMH dated January 16, 2007 and later was received subsequent to Plaintiff's hearing before the ALJ. See Tr. at 297-323.

[8]     Dr. Hodan's evaluation was received subsequent to Plaintiff's hearing before the ALJ. See Tr. at 270.

"stable" with medications.  Tr. at 271.  Dr. Hodan opined Plaintiff would need a "low-stress work setting."  Tr. at 271.  Dr. Hodan's main diagnosis was "Schizoaffective Disorder[.]"  Tr. at 271.  Plaintiff's GAF score was fifty-five.  Tr. at 272.  According to Dr. Hodan, Plaintiff would have "Moderate" difficulty understanding and remembering detailed instructions, and carrying out detailed instructions.  Tr. at 274.  He would have no difficulty with remembering short instructions, or with carrying out short instructions.  Tr. at 274.

Plaintiff underwent a colonoscopy on March 1, 2007.  Tr. at 282.  He was also seen for an initial screening at Gastroenterology St. Petersburg on April 25, 2007.[9]  Tr. at 278.

On March 13, 2007, Plaintiff returned to SCCMH.  Tr. at 312.  His GAF score was forty-nine.  Tr. at 320.  Plaintiff appeared for appointments with SCCMH on March 22, 2007, March 26, 2007, and April 23, 2007.  Tr. 307, 306, 305.  The latter two appointments were with Ms. McLaughlin.  Tr. at 306, 305.  Plaintiff self-reported as "status quo."  Tr. at 306, 305.  His GAF score on both occasions was forty-eight.  Tr. at 306, 305.  Plaintiff appeared for a progress appointment on April 27, 2007, but did not appear for an appointment on April 30, 2007.  Tr. at 303, 302.

On April 9, 2007, Plaintiff was seen by Lalitha E. Jacob, M.D. ("Dr. Jacob") for an initial neurology consultation.[10]  Tr. at 277.  At that time, Dr. Jacob did not diagnose the cause of Plaintiff's headaches, and requested to see the results of his MRI which had been performed December 11, 2006.  Tr. at 277; see also Tr. at 283-84.  On May 9, 2007, Plaintiff

---

[9]     Documentation of the colonoscopy and the initial screening was received subsequent to Plaintiff's hearing before the ALJ.  See Tr. at 282, 278.

[10]     This documentation was received subsequent to Plaintiff's hearing before the ALJ.  See Tr. at 277.

was seen at Eye Associates of Pinellas regarding his complaints of blurred vision.[11]  Tr. at 285.

On May 25, 2007, Plaintiff appeared at the emergency room of St. Anthony's Hospital.[12]  Tr. at 286-96.  He had swelling and pain in his left knee.  Tr. at 287.  Plaintiff was prescribed Motrin and told to rest and elevate the knee.  Tr. at 293.

After the ALJ rendered a Decision in this matter, Plaintiff was permitted to submit additional evidence.  See Tr. at 328.  Plaintiff submitted a psychiatric evaluation authored by Ms. McLaughlin of SCCMH, dated June 4, 2007.  Tr. at 330-31.  Ms. McLaughlin opined that when Plaintiff is on medications, he "appears stable for the most part."  Tr. at 331.  Plaintiff's GAF score at that time was forty-six.  Tr. at 331.  Plaintiff also submitted documentation from Your Care Clinics regarding treatment in late 2006 and early 2007 for chronic headaches and dizziness.[13]  Tr. at 333-40.  Finally, Plaintiff submitted documentation from Tampa Bay Orthopaedic Specialists regarding his knee problems.  Tr. at 346-51.

### B.    Testimony During the Hearing[14]

Two witnesses testified during Plaintiff's hearing before the ALJ.  Plaintiff testified on his own behalf (Tr. at 362-87), and an impartial vocational expert testified (Tr. at 388-89).

---

[11]    This documentation was received subsequent to Plaintiff's hearing before the ALJ.  See Tr. at 285.

[12]    This documentation was received subsequent to Plaintiff's hearing before the ALJ.  See Tr. at 286.

[13]    According to a letter from Plaintiff's representative at the time, this documentation from Your Care Clinics was also submitted to the ALJ prior to the Decision being rendered.  Tr. at 332.

[14]    Plaintiff's hearing before the ALJ was originally scheduled for August 10, 2006, but was continued to November 30, 2006 so Plaintiff could appear with a representative.  Tr. at 352-58.

Plaintiff testified that his bipolar disorder makes him have "vibration thoughts" and makes it difficult to "focus and get jobs completed, get jobs done." Tr. at 368. He has problems with paying attention: he can read for about fifteen to twenty minutes before having to rest. Tr. at 382. He also "get[s] dizzy." Tr. at 366. Plaintiff testified that since he has "been off the streets," he is "not as bad off as [he] was" and he sleeps at night. Tr. at 370. He does not have any desire to "hurt" himself. Tr. at 371. Plaintiff testified he is taking his medications as directed. Tr. at 374. Although he occasionally has some feelings of guilt and worthlessness, "the medication is really helping." Tr. at 382.

Plaintiff's headaches and dizziness seem to be caused by the sun and its heat. Tr. at 383. Plaintiff testified that he takes a nap "once or twice a day" for "[a]bout an hour or hour-and-a-half." Tr. at 384. Plaintiff attributed his need for naps to the medication he is taking. Tr. at 384.

The vocational expert, Ms. Manning, was called upon to determine if Plaintiff could perform any jobs in the national economy given his non-exertional limitations. The ALJ presented Ms. Manning with the following:

> [A]ssume an individual approaching advanced age of 52. [A]s far as I have in the record, there are no exertional limitations. There is some vague testimony of such, but in this hypothetical, there will be none, with the following non-exertional limitations: unskilled, low-stress work, primarily working with things rather than people, entry level, routine and repetitive - - if I didn't already say it. With those limitations, can you describe any work?

Tr. at 388. Ms. Manning testified the jobs of "stocker," "packer," and "[a]uto detailer" fit the hypothetical. Tr. at 388-89. Those jobs are consistent with the Dictionary of Occupational Titles. Tr. at 389. All of the jobs require consistent attendance, and they would be affected

if the worker could not stay on task "one-third to two-thirds of the day[.]" Tr. at 389.  If a worker had to take a nap during the work day, all jobs would be eliminated.  Tr. at 389.

### C.    The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the Plaintiff: 1) is currently employed;  2) has a severe impairment;  3) is disabled due to an impairment meeting or equaling one listed in the regulations;  4) can perform past relevant work;  and 5) retains the ability to perform any work in the national economy.  See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).

After assessing Plaintiff's file, testimony, and medical and psychological history, the ALJ determined Plaintiff suffers from the following "severe" impairments: "bipolar disorder and schizoaffective disorder." Tr. at 22.  The ALJ determined Plaintiff's impairments do not result in one of the established impairments listed in the regulations.  Tr. at 24.  The ALJ found that Plaintiff is able to "perform work at all exertional levels." Tr. at 24.  However, the ALJ limited Plaintiff's ability to "unskilled, low stress work" involving "one to two step, routine, repetitive tasks, working with things rather than people, and working in an entry level position." Tr. at 24 (emphasis omitted).  Relying on the vocational expert's testimony, the ALJ found that Plaintiff could perform the jobs of "Stocker," "Packer," and "Auto detailer." Tr. at 28.  In a Decision entered on June 29, 2007, the ALJ ruled Plaintiff is not disabled for purposes of receiving supplemental security income and denied his claim. Tr. at 28.

### III.   Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

### IV. Discussion

Plaintiff challenges the ALJ's decision on two grounds.  First, Plaintiff contends the ALJ improperly discounted the GAF scores assigned by Plaintiff's treating sources.  Pl.'s Mem. at 3-8.  Second, Plaintiff argues the ALJ failed to consider the side effects associated

with his medications; namely, the naps he frequently takes and chronic headaches and dizziness. Id. at 8-10. Each argument is discussed in turn.

## A. GAF Scores Assigned by Staff at SCCMH

Plaintiff points to the ALJ's assignment of "little weight" to GAF scores by staff at SCCMH. Pl's. Mem. at 3; Tr. at 26. Plaintiff argues that the ALJ's assignment "fails to take into account the existence of psychotic symptoms, such as auditory hallucinations. . . somewhat convoluted explanations with some paranoid thinking. . . suicidal thoughts. . . and hearing voices with poor sleep and poor concentration." Pl's. Mem. at 3 (citing Tr. at 165-66, 193-94, 173-79, 308). Defendant argues the staff at SCCMH cannot be considered "treating source[s]" because the records are not authored by licensed psychologists or psychiatrists, but instead are authored generally by nurse practitioners and mental health counselors or social workers. Memorandum in Support of Commissioner's Decision (Doc. No. 19; "Deft.'s Mem.") at 5-7. Additionally, Defendant contends that Plaintiff "has failed to identify any medical opinion from [SCCMH] that undermines the ALJ's RFC finding." Id. at 7. Finally, Defendant takes issue with Plaintiff's reliance on GAF scores, noting that GAF scores have not been endorsed by the Social Security Administration for use in determining eligibility for benefits or supplemental security income. Id. at 8.

Given the parties' respective arguments, the undersigned addresses the issues as follows. First, it is determined whether it was permissible for the ALJ to consider the records authored by staff at SCCMH. Second, the undersigned addresses how GAF scores are generally viewed by the Commissioner and the courts and the weight given to the scores in determining the severity of an individual's impairment. Third, it is determined whether the ALJ's decision to discount the scores is supported by substantial evidence in the record.

The Code of Federal Regulations lists acceptable "[s]ources who can provide evidence to establish an impairment." 20 C.F.R. § 404.1513(a); 20 C.F.R. § 416.913(a). The acceptable sources are: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a); 20 C.F.R. § 416.913(a). Although nurse practitioners, mental health counselors, social workers and the like are not listed as acceptable medical sources for the purpose of <u>establishing</u> an impairment, "evidence from other sources [may be used] to show the <u>severity</u> of [the claimant's] impairment(s) and how it affects [the] ability to work." 20 C.F.R.§ 404.1513(d); 20 C.F.R. § 416.913(d) (emphasis added) (stating other sources may include "nurse-practitioners . . . and therapists"). Furthermore, "[t]he opinions of a treating nurse practitioner constitute 'evidence to be considered on the record as a whole.'" <u>Corbitt v. Astrue</u>, No. 3:07-cv-518-J-HTS, 2008 WL 1776574, at *1 (M.D. Fla. Apr. 17, 2008) (unpublished) (quoting <u>Gramlisch v. Barnhart</u>, 464 F. Supp. 2d 876, 881 (E.D. Mo. 2006)). The undersigned recognizes the GAF scores discounted by the ALJ were not assigned by acceptable treating sources. However, to the extent Plaintiff relies on them to demonstrate the severity of his impairments and how they affect Plaintiff's ability to work, rather than the existence of impairments, the scores were properly considered by the ALJ. <u>See</u> 20 C.F.R.§ 404.1513(d); 20 C.F.R. § 416.913(d).

Plaintiff focuses his argument on the ALJ's rejection of the GAF scores assigned to him by staff (including nurse practitioners) at SCCMH. As previously explained, "[t]he [GAF] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." <u>Mathis v. Astrue</u>, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at

*7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 32). The GAF score is necessarily "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." Deboard v. Comm'r of Soc. Sec., No. 05-6854, 211 F. App'x 411, 415-16 (6th Cir. 2006) (unpublished) (internal quotation omitted). Although GAF scores frequently have been cited in Social Security disability benefits determinations, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 Fed. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, 2001 WL 1173632 (Aug. 21, 2000)); see also Parsons v. Astrue, No. 5:06cv217/RS-EMT, 2008 WL 539060, at *7 (N.D. Fla. Feb. 22, 2008) (unpublished) (noting same).

As a result of the Commissioner's refusal to endorse the GAF scale, and due to the subjectivity of the clinician's determination involved in assigning the GAF score, courts appropriately assign GAF scores limited weight in reviewing an ALJ's determination regarding a plaintiff's functional capacity. Indeed, as noted by a court in this district, "[r]eliance upon a GAF score is of questionable value in determining an individual's mental functional capacity." Gasaway v. Astrue, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla. Mar. 3, 2008) (unpublished) (citing Deboard, 211 F. App'x at 415-16).

Here, the ALJ considered Plaintiff's GAF scores from SCCMH but assigned "little weight" thereto, explaining as follows:

> Progress notes generally show GAF scores ranging from 48, indicating serious symptoms or any serious impairment in school, social, or occupational functioning, to 52, indicating moderate symptoms or any serious impairment in school, social or occupational functioning. However, these scores are not supported by the respective narratives. For example, in May 2004, the claimant stated that his mood had been stable and he had no increase of depressive symptoms, yet he was assigned a GAF of 49. Similarly, in December 2004, he stated he has been doing quite well and the only significant finding on examination was mild guardedness, but he was assigned a GAF of 52. Further, in September 2006, it was noted that the claimant's mood was stable, he was not depressed, and he was doing well, yet he was assigned a GAF of 50. Finally, in April 2007, it was noted that the claimant's GAF was 48, yet the narrative stated that he was stable[.]

Tr. at 26. Plaintiff specifically argues this reasoning fails to take into account the existence of his "psychotic symptoms, such as auditory hallucinations. . . and hearing voices[.]" Pl.'s Mem. at 3. Although Plaintiff did occasionally report experiencing auditory and/or visual hallucinations, see Tr. at 112, 127, 165, 198-99, the record indicates these symptoms were under control when he was taking his medications as directed. During the times these symptoms were under control, he was nonetheless assigned scores similar to those he received while experiencing the symptoms. The ALJ's decision to discount GAF scores assigned when Plaintiff did not report auditory hallucinations or visual hallucinations is supported by substantial evidence.

Furthermore, in May 2004, although Plaintiff reported to Dr. Appenfeldt seeing things and hearing voices, Dr. Appenfeldt did not see any indication of symptoms of hallucinations or hearing voices. See Tr. at 199. Most recently in February 2007, Plaintiff told Dr. Hodan his hallucinations were in remission. See Tr. at 271. Finally, Plaintiff testified that the medication he is taking "is really helping." Tr. at 382. Therefore, Plaintiff's argument in this regard is not well taken.

Plaintiff also argues he had suicidal thoughts and those were not taken into account when the GAF scores were discounted. Pl.'s Mem. at 3. Again, Plaintiff did report some suicidal or homicidal ideation early in his treatment, but reports of those thoughts dwindled with time, suggesting that Plaintiff's medication was controlling those thoughts as well. See Tr. at 196, 194, 183, 179. Also, Plaintiff's testimony at the hearing was that he does not have any desire to "hurt" himself. Tr. at 371. The ALJ did not err by not discussing the early suicidal or homicidal ideation in discounting the GAF scores assigned at SCCMH.

Finally, Plaintiff cites the ALJ's failure to discuss Plaintiff's "somewhat convoluted explanations with some paranoid thinking" in discounting the assigned GAF scores. Pl.'s Mem. at 3. In support, Plaintiff cites a psychiatric evaluation report from SCCMH dated May 28, 2002. Id. (citing Tr. at 193-94). The undersigned notes that the ALJ did not comment on GAF scores from this time period. Regardless, over time, Plaintiff gained stability and self-reported that the medications were assisting him, which was confirmed by staff at SCCMH. Tr. at 233, 224, 323, 306, 305, 331. Therefore, it was unnecessary for the ALJ to discuss "convoluted explanations" and "paranoid thinking" occurring early in Plaintiff's treatment.

Even if the GAF scores assigned had not been discounted in assessing Plaintiff's residual functional capacity, they would not have necessarily led to a finding of disability. The undersigned notes that Plaintiff's scores assigned by SCCMH staff ranged between forty-six and fifty-five. A GAF score between forty-one and fifty denotes "Serious symptoms . . . or any serious impairment in social, occupational, or school functioning." DSM-IV at 34 (emphasis omitted). A GAF score in the range of fifty-one to sixty indicates only "moderate" symptoms or difficulties. Id. at 34. With regard to scores in the "[s]erious

symptoms" category, "courts generally find that a GAF score of 50 or below is not in and of itself determinative of disability." Jones v. Astrue, 494 F. Supp. 2d 1284, 1288 (N.D. Ala. 2007) (citing, among others, Hillman v. Barnhart, 48 F. App'x 26, 30 n.1 (3d Cir. 2002) (unpublished) (noting a GAF score of fifty indicates a claimant is capable of performing some substantial gainful activity); Seymore v. Apfel, 131 F.3d 152, 1997 WL 755386 at *2 (10th Cir. 1997) (explaining that a GAF score of forty-five does not necessarily prove a claimant is unable to hold a job); but see Lloyd v. Barnhart, 47 F. App'x 135, 135 n.2 (3d Cir. 2002) (noting that a vocational expert opined that a GAF score below fifty indicates an inability to keep a job)). Thus, even were Plaintiff's GAF scores, in and of themselves, to be afforded considerable weight, the result would likely not have changed.

In sum, the undersigned concludes that the ALJ's decision to assign "little weight" to the GAF scores given by staff at SCCMH is supported by substantial evidence in the record.

## B.    Side Effects Associated With Plaintiff's Medications

Plaintiff next argues that the ALJ failed to properly consider the side effects associated with his medications. Pl.'s Mem. at 8-10. Namely, Plaintiff relies on his testimony that he takes one to two naps per day, and suffers from chronic headaches and dizziness, and argues these are side effects of the medications he is taking. Id.

To establish a disability based on testimony of pain or other subjective symptoms, a claimant must satisfy two parts of a three-part showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged subjective symptoms; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed subjective symptoms. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223

(11th Cir. 1991)) (stating that "the standard also applies to complaints of subjective symptoms other than pain")).  "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Holt, 921 F.2d at 1223.

"[C]redibility determinations are the province of the ALJ." Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005).  If, after considering such subjective testimony, the ALJ decides to discredit the testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225; see also Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005); Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (stating that "after considering a claimant's complaints of pain [or other subjective symptoms], the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence").  "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications, and (5) treatment or measures taken by the claimant for relief of symptoms." Davis v. Astrue, 287 F.App'x 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)); see also 20 C.F.R. § 416.929(c)(3)(i)-(vi) (providing the same).

In determining Plaintiff's functional limitations resulting from his alleged symptoms, the ALJ found Plaintiff "is not generally credible and is capable of doing more than he alleges."  Tr. at 26.  Plaintiff does not challenge the ALJ's decision with respect to his credibility regarding functional limitations; rather, he challenges the ALJ's failure to consider the alleged side effects from his medications.  See Pl.'s Mem. at 8-9.  Plaintiff does not cite

any objective medical evidence in the record documenting the symptoms he alleges as side effects of his medications. However, he does allege there is some documentation of his headaches and dizziness, and he argues that the symptoms he is experiencing could be side effects of his medications. Id.

The only evidence in the record indicating Plaintiff takes naps as a result of his medications is his own testimony. See Tr. at 384. In this regard, Plaintiff does not point to any objective medical evidence of the side effect he alleges. See Wilson, 284 F.3d at 1225 (internal citation omitted). Accordingly, the record does not support Plaintiff's allegations concerning his need for naps during the day. See French v. Massanari, 152 F. Supp. 2d 1329, 1337 (M.D. Fla. 2001) (when "the only indication in the entire record of the side effects of [the plaintiff's] medications [was] his statement before the administrative law judge implying that his pain medication [made] him 'groggy,'" the ALJ was not required "to inquire further into possible side effects"); Holley v. Chater, 931 F. Supp. 840, 850 (S.D. Fla. 1996) (when the only evidence in the record that medication made the plaintiff "dizzy and drowsy" was his own testimony, the "scant evidence [was] insufficient to support a finding of disability").

To the extent Plaintiff alleges that the dizziness and headaches are side effects of his medication, the undersigned notes that there is medical documentation of Plaintiff occasionally suffering from these problems, but the physicians seeing Plaintiff did not opine that they are caused by his medications. See Tr. at 367-68, 277, 333-40.[15] It may be

---

[15]    The documentation from Your Care Clinics regarding treatment for chronic headaches and dizziness in late 2006 and early 2007 was submitted after the ALJ rendered his Decision. See Tr. at 333-40. "[A] federal district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision[.]" Ingram v. Comm'r Soc.
(continued...)

argued that the medications could reasonably be expected to give rise to the symptoms Plaintiff claims, but there is no record evidence of this occurring. Accordingly, Plaintiff has failed to meet his burden of "producing evidence in support of his claim." See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(a); 20 C.F.R. § 416.912(c)).

Regardless, Plaintiff's representations preclude his argument that the dizziness and headaches are side effects of his medications. Namely, even when inquiry was made, Plaintiff did not report any adverse side effects from his medications, Tr. at 245, and there is no indication in the record that the medical personnel treating Plaintiff were concerned about possible side effects occurring. See French, 152 F. Supp. 2d at 1338 (recognizing "the notable absence in [the plaintiff's] medical records of any complaints by [the plaintiff] about side effects of his medications" and the lack of indication in the record "that any of the many doctors that examined and treated [the plaintiff] was concerned about the potential side effects of his medications"). Furthermore, Plaintiff's own testimony at the hearing was that the dizziness and headaches are caused by the sun and its heat. Tr. at 383. Therefore, the ALJ did not err in declining to address the alleged side effects of Plaintiff's medications. Because the ALJ's decision in this regard is supported by substantial evidence in the record, the ALJ was not required to include the alleged side effects in his hypothetical to the vocational expert. See White v. Apfel, No. Civ.A. 99-0416-RV-S, 2000 WL 724410, at *8 (S.D. Ala. May 15, 2000), aff'd, 258 F.3d 1180 (11th Cir. 2001) (unpublished table decision)

---

[15](...continued)
Sec. Admin., 496 F.3d 1253, 1258 (11th Cir. 2007). "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the [Decision] erroneous." See id. at 1262. The undersigned has reviewed the evidence submitted to the appeals council, and concludes that the Decision in this matter is not rendered erroneous.

(after concluding the plaintiff's subjective allegations of pain did not meet the pain standard in the Eleventh Circuit, finding "the ALJ was under no obligation to include [the plaintiff's] allegations of disabling pain in his hypothetical question to the vocational expert").

## V.  Conclusion

The ALJ's treatment of the GAF scores assigned by staff at SCCMH is supported by substantial evidence in the record.  Furthermore, the ALJ's determination regarding Plaintiff's residual functional capacity is supported by substantial evidence, even though he did not address the side effects of the medications Plaintiff alleges.

In accordance with the foregoing, it is **RECOMMENDED**:

1.     That the Clerk of Court be directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by § 1383(c)(3) **AFFIRMING** the Commissioner's final decision.

2.     That the Clerk of Court be directed to close this case.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on August 5, 2009.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

kaw

Copies to:

Honorable Steven D. Merryday
United States District Judge

Counsel of record